# Collins, Appellant, *v.* Kephart et al.

*Constitutional law — Appropriations — Denominational and sectarian institutions—Statutes — "Sect or denomination" — Words and phrases.*

1. The purpose of article III, section 18, of the Constitution of Pennsylvania, which prohibits appropriations for charitable, educational or benevolent purposes "to any denominational or sectarian institution," is to prohibit the State from giving any recognition, directly or indirectly, to a religious sect or denomination, in recognition of the set purpose to divorce absolutely church and state.

2. The section forbids state aid to institutions affiliated with a particular religious sect or denomination, or which are under the control, domination, or governing influence of any religious sect or denomination.

3. The ordinary understanding of the phrase "sect or denomination" is a church or body of persons in some way united for purposes of worship who profess a common religious faith, and are distinguished from those composing other such bodies by a name of their own.

4. When simple words are used in the Constitution, they must be read according to their plain, generally understood, or popular meaning.

5. Although an institution under control of a religious body may bestow its benefits on others, and permit those outside the ranks of the sect or denomination involved, to take part in its management, it is none the less a sectarian or denominational institution within the inhibition of the Constitution against state aid.

6. The fact that during a period of forty years appropriations had been made to sectarian and denominational institutions, and had been generally acquiesced in by the public authorities, does not warrant such course or give it legality.

7. Where the charter of a hospital provides for a denominational board of directors, the creation of a local board consisting of members of various denominations, to conduct the hospital, will not entitle it to state aid, where the local board has no authority over the internal management of the hospital, and may be removed at the instance of the denominational board.

8. A hospital whose managers consist, under its charter, of the rector, church warden, and vestrymen of a particular church is a sectarian and denominational institution, and it is immaterial that it admits all persons as inmates, without distinction of race, color or religion.

9. Such an institution cannot bring itself within the benefit of the appropriation by separating itself from the church after the appropriation bill was passed. The facts must be treated as they were at the time the act was approved.

10. A college is within the constitutional inhibition, where its name indicates a relation with a distinctly religious organization, which supplied most of the members of its faculty, and which had supported to a large extent the undertakings of the college, and where it further appears that services of such religious organization were held in its chapel, and a course in its tenets were given in its curriculum, although attendance on services and the course were not compulsory.

11. A hospital is not entitled to state aid, where it appears that, although its charter indicated no sectarian purpose, yet it occupied property owned by a sectarian society under a contract which gave the owner full "executive management and control" of the institution; and this is the case, although the contract provided that the hospital should be "nonsectarian," and that its doors should be open to all alike, without distinction as to creed, color or race.

12. A hospital whose management is by its charter confined to persons of the "Jewish faith" where they can place their sick, and there can enjoy during their illness the consolation of their religion, is a sectarian institution, and this is so, although the chief physician and chief nurse are not Jews, and the great body of the patients are outside of that faith, and none are required to attend religious services.

13. The Jews are commonly believed to constitute a distinct religious body or sect, and to all such bodies, whether Christian or otherwise, the constitutional inhibition applies.

*Appeals—Findings—Writings—Deductions—When findings are not conclusive.*

14. The findings of a trial court, which are the results of deductions from facts averred in written pleadings, do not possess the binding qualities of conclusions based on oral evidence.

*Constitutional law—Unconstitutional statutes.*

15. Courts are always loath to put a construction on legislation which shows it to be unconstitutional.

Argued May 25, 1921. Appeals, Nos. 13-17, May T., 1921, by plaintiff, from decree of C. P. Dauphin Co., Nos. 649-653, Equity Docket, 1920, on bills in equity, in case of Willis Collins v. Harmon M. Kephart, State Treasurer, and the Institution of Protestant Deaconess et al. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON and SADLER, JJ. Reversed.

Bills in equity for injunction. Before WICKERSHAM, J. The opinion of the Supreme Court states the facts. Bills dismissed. Plaintiff appealed.

*Error assigned,* among others, was decree, quoting it.

*Luther S. Kauffman, F. C. Menamin* and *Evan B. Lewis,* for Willis Collins, appellant.—The trend of governmental policy in the United States has been to divorce church and state: Lindenmuller v. People, 33 Barbour 548; State ex rel. Weiss v. School Dist., 76 Wis. 177; State of Nevada ex rel. Nevada Orphan Asylum v. Hallock, 16 Nevada 373.

In line also of this constitutional prohibition of aid to certain institutions, is the legislation against the teaching or promotion of sectarian tenets or doctrines in the public schools: Hysong v. Gallitzin Boro. Sch. Dist., 164 Pa. 629.

The legislature had no legal right to pass a bill forbidden by the Constitution: Van Horne v. Dorrance, 2 Dallas 304; Wilkinson v. Leland, 2 Peters 627; Hysong v. Gallitzin Boro. Sch. Dist., 164 Pa. 629.

Doctrines may be presumed from title of organization: Hale v. Everett, 53 N. H. 9; Greek Catholic Church v. Orthodox Greek Church, 195 Pa. 425; Roshi's App., 69 Pa. 462; Sutter v. First Reformed Dutch Church, 42 Pa. 504; McGinnis v. Watson, 41 Pa. 9; Presbyterian Congregation v. Johnston, 1 W. & S. 9.

The meaning of the words "sectarian institution" is carefully analyzed in Nevada Orphan Asylum v. Hallock, 16 Nevada 373.

See also Cook County v. Chicago Industrial School for Girls, 125 Ill. 540; State v. Scheve, 91 N. W. 846.

A bequest to the consistory of a church composed of the ministers, elders and deacons, is in effect a bequest to the church corporation itself: Consistory of R. D. Church v. Brandow, 52 Barb. (N. Y.) 228.

*Robert S. Gawthrop,* First Deputy Attorney General, for Commonwealth of Pennsylvania, in behalf of Harmon M. Kephart, State Treasurer, appellee.—The term "sectarian" in its common acceptation implies more than a mere general reference to a sect. It means something devoted to or promotive of the interests of a sect: State of Nevada v. Hadlock, 36 Pac. R. 373; Sargent v. Board of Education, 177 N. Y. 317; Cook County v. Industrial School for Girls, 125 Ill. 540; State ex rel. v. School District Board, 162 Wis. 482.

*William H. Earnest,* of *Earnest & Milnor,* with him *Gwilym A. Price,* for the Institution of Protestant Deaconesses, appellee, cited: Bradfield v. Roberts, 175 U. S. 291.

*John C. Bane,* with him *Joseph A. Beck,* for Duquesne University of the Holy Ghost, appellee, cited: State ex rel. v. Board of Trustees of Westminster College, 175 Mo. 52; Watson's Case, 171 N. Y. 256; Hamsher v. Hamsher, 132 Ill. 273; Updegraph v. Com., 11 S. & R. 394; Moers v. City of Reading, 21 Pa. 188.

*W. W. Porter,* of *Porter, Foulkrod & McCullagh,* for St. Timothy's Hospital and House of Mercy, appellee, cited: Union Baptist Assn. v. Hunn., 7 Texas Civ. App. 249; Speer v. Colbert, 200 U. S. 130.

*Morris Wolf,* with him *J. E. B. Cunningham* and *Ephraim Leder,* for Jewish Hospital of Philadelphia, appellee, cited: Kucker v. Sunlight, etc., Co., 230 Pa. 528; Com. v. Herr, 229 Pa. 132.

*J. A. Gleason,* with him *John T. Brady,* for Sisters of Mercy of Crawford and Erie Counties, appellee, cited: Bradfield v. Roberts, 175 U. S. 291; Updegraff v. Com., 11 S. & R. 394; Hysong v. School Dist., 164 Pa. 629.

Opinion by Mr. Chief Justice Moschzisker, July 1, 1921:

Mr. Justice Schaffer did not hear the present appeals, because, when attorney general, he contended in the court below for the validity of the appropriations now under attack; and Mr. Justice Kephart declined to sit because his brother was named as a party to the record.

These five cases were argued at the same time and may be disposed of in one opinion; all are suits in equity, on taxpayer's bills, to restrain the payment of moneys appropriated to certain charitable, educational or benevolent establishments, each of which is alleged to be a denominational or sectarian institution. All five bills were dismissed, and plaintiff has appealed.

Article III, section 18, of the Constitution of Pennsylvania provides: "No appropriation, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes to any person or community, nor to any denominational or sectarian institution, corporation or association."

The history of the development of social and political life in America shows a set purpose to divorce, abso-

lutely, church and state: and this is the real underlying explanation of provisions like the one now before us, which appear, in one form or another, in the constitutions of many American commonwealths. The intent of these provisions was, and therefore still is, to forbid the state from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and education; they in effect provide that, to serve charitable, educational or benevolent purposes, the money of the people shall not be put under denominational control or into sectarian hands, for administration or distribution, no matter how worthy the end in view.

It will be noted, the Constitution does not say merely that no appropriations shall be made for sectarian or denominational purposes, nor does it confine the limitation against state aid to these institutions which actually teach sectarian doctrines or promote denominational interests; what it provides is, that "no appropriation shall be made to any denominational or sectarian institution." These words, when taken at their face value, are most comprehensive in scope; they plainly forbid state aid to institutions affiliated with a particular religious sect or denomination, or which are under the control, domination or governing influence of any religious sect or denomination, the ordinary understanding of the phrase "sect or denomination" being a church, or body of persons in some way united for purposes of worship, who profess a common religious faith, and are distinguished from those composing other such bodies by a name of their own.

After studying and reflecting upon the carefully prepared opinions of the court below, the arguments of able counsel and the authorities cited, we have reached the deliberate conclusion that, when a charitable, benevolent or educational establishment is "denominational or sectarian" according to the meaning of this term as understood by the average man, even though the institution in

question may bestow its benefits on others and permit those outside the ranks of the sect or denomination involved to take part in its management, it is none the less a sectarian or denominational institution, within the inhibition of the Constitution against state aid.

When simple words are used in writing the fundamental law, they must be read according to their plain, generally understood, or popular, meaning; with this thought in mind, we restate the provision under discussion: "No appropriation......shall be made for charitable, educational or benevolent purposes to......any denominational or sectarian institution." How could the definite thought that institutions, under denominational or sectarian tutelage, shall not receive state aid, be more simply expressed? We cannot doubt that the average voter, when he read these plain words, must have understood that no public moneys could be appropriated, lawfully, to institutions other than those entirely unconnected with any of the various religious sects or denominations; the law, being so written, must be enforced accordingly.

It appears from a table, printed in the paper-books of one of appellants, which table is not challenged by any of the appellees, that no appropriations to sectarian institutions were attempted until the year 1881, when $30,000 was set aside for that purpose. The table shows, with the exception of 1889, a steady increase of these appropriations, until 1919, when they reached the grand total of $2,120,689. During this period two governors vetoed such appropriations, on the distinct ground that they breached the Constitution; but the majority of our executives have followed the construction placed on the fundamental law by the legislatures, permitting gifts of this kind to stand; and the claim is now made that, after all these years, we should do likewise.

The argument just stated does not appeal to us; long persistence in a breach of the Constitution neither warrants the course pursued nor gives it legality: Kucker

v. Sunlight, etc., Oil Co., 230 Pa. 528. 533. The other two departments of government, in making and passing on appropriations of the character before us, generally consider questions of right and expediency alone, leaving constitutional points to the courts; but, when the latter come here for determination, our duty is plain, we must follow and enforce the organic law as written, suffer who may.

Cases from other jurisdictions, involving different facts, can be, and have been, cited to us by counsel on both sides; but none of these is of any particular aid, and it will serve no useful purpose to discuss them. Hysong v. Gallitzin Borough School District, 164 Pa. 629, 640-43, throws some light upon the points in this case, though not much; and we may say as to Bradfield v. Roberts, 175 U. S. 291, largely relied on by the court below and appellees, that it deals with a different state of facts and law from those at bar.

All five cases here for review involve the same legal principles; but each of them presents its own facts, which require consideration. In this connection, before entering upon a brief discussion of the individual appeals, we take occasion to say that the trial court's findings, being the result of deductions from facts averred in written pleadings, do not possess the binding qualities of conclusions based on oral evidence: Hindman's App., 85 Pa. 466, 470; Milligan's App., 97 Pa. 525, 532; Woodward v. Carson, 208 Pa. 144, 145; Com. Title Ins. & Trust Co. v. Seltzer, 227 Pa. 410, 416.

The first appeal involves an appropriation to the Passavant Hospital of Pittsburgh, which was founded by the Reverend W. A. Passavant, some time prior to 1849. It appears that this establishment, and its property, is owned by a Pennsylvania corporation called "The Institution of Protestant Deaconesses," the charter of which provides, "That, as the persons composing the aforementioned society are members of the Evangelical Lutheran Church, and desire to remain unmolested in

the free exercise of their religious faith and worship, it is hereby provided that no one shall be elected director or vice-director of the institution who is not a clergyman in good and regular standing in some one of the synods of said church in the United States." This charter was amended in 1902 by the insertion of a provision that two of the hospital board might be laymen, but declaring that all members must belong to the Evangelical Lutheran Church. In the face of these charter provisions, it is idle to contend that defendant corporation is not a denominational or sectarian institution; but it appears that, in 1919, while the appropriation bill in controversy was in course of passage, defendant by duly formulated resolutions, created "a local board......with [alleged] legal power to conduct the Passavant Hospital," and it now contends that this board is a purely nonsectarian body, which may collect and expend the appropriation from the State.

The board in question consists of five men, of different religious faiths; but the resolutions creating it expressly provide that its authority shall in no wise conflict with the internal management of defendant corporation; that, when more than $10,000 is to be expended, the matter shall "first be submitted to the board of the Institution of Protestant Deaconesses for approval"; and that this latter board is to have the right, when in its judgment the interests of the hospital so require, to demand the resignation of any or all members of the local board.

It is quite apparent that the creation of the so-called local board represents simply an effort to make the Passavant Hospital appear as though it were not a denominational institution, and thus enable it to obtain state aid; but that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt. The appropriation under attack, having in fact been made to a sec-

tarian and denominational institution, cannot stand in law.

The next appeal concerns an appropriation to St. Timothy's Memorial Hospital and House of Mercy, a Pennsylvania corporation located in Roxborough, Philadelphia. The charter of this institution provides that membership in the corporation shall consist, inter alia, of the rector, church warden and vestrymen, for the time being, of a certain Protestant Episcopal church, called St. Timothy's; that the business of the hospital shall be directed by fifteen managers, to be elected annually by the vestry of the church, of whom one shall always be the parish rector, who shall be warden of the hospital; that the nursing shall be done by sisters or deaconesses of the protestant church, or by other trained women. The charter also provides that in certain contingencies, "The Bishop for the time being of the Protestant Episcopal Church in the Diocese of Pennsylvania in which Philadelphia is situated," shall designate the manner of electing directors of the hospital. Since the date of the appropriation now under attack and the filing of the bill in this case, the name of defendant has been changed to the "Memorial Hospital of Roxborough, Philadelphia," and other efforts appear to have been made to separate the institution from the control of St. Timothy's church; but, of course, the facts must be treated as they were at the time the act under attack was approved. While all persons, without distinction of race, color or religion, are admitted to defendant hospital, yet there can be no doubt that it is a sectarian institution within the meaning of that term as used in the Constitution; therefore the appropriation to it fails in law.

We must now consider an appropriation to the Duquesne University of the Holy Ghost, named in the act as the Duquesne University of Pittsburgh, which is its popular designation; its charter purpose "is to support and maintain a college for the instruction of youth in all the branches of a thorough moral and secular education,

including languages, the liberal arts and sciences, and to confer the usual scholastic degrees and to establish, maintain and conduct courses of instruction and to confer degrees in the sciences of law, medicine, dentistry and pharmacy."

Defendant's original charter name was "Pittsburgh Catholic College of the Holy Ghost," which, after undergoing another change, was altered in 1911 to its present title. The chancellor found that the words "Holy Ghost" were used, throughout these changes of title, "in recognition of the relation existing between said corporation and another distinct Catholic organization known as 'The Society of the Holy Ghost,' which in past years supplied most of the members of the faculty, and supported to a very large extent the undertakings of said corporation"; also that the word "Duquesne" was selected as the name of an early Catholic governor of the province in which Fort Duquesne was located.

It appears that religious ceremonies, according to the doctrines of the Roman Catholic Church, are conducted in this institution; but the students, many of whom are outside the Catholic faith, need not attend. In the high school department alone courses of instruction in the tenets of the Roman Catholic Church are given, which courses are elective; but the court found that no part of the money appropriated by the State is used to "maintain such courses of instruction." There is, however, nothing in the act, making the appropriation, which forbids spending the state's money on this or any other department of the institution. We can but conclude that the institution in question is sectarian and denominational, within the inhibition of the Constitution, and may not receive state aid.

Another appropriation attacked is to the Dubois Hospital Association, a Pennsylvania corporation, whose charter indicates no sectarian purpose; but the property occupied by this institution is owned and operated by another Pennsylvania corporation called the "Sisters of

Mercy of Crawford and Erie Counties," which is named as the defendant, and which the court below very properly found to be a sectarian institution. The Sisters of Mercy operate the hospital under a contract with the first mentioned corporation. This writing provides that defendant shall "establish," operate and maintain a hospital; that it shall furnish the skilled services "necessary in conducting the hospital......, the expenses thereof to be defrayed out of or from the general funds of the hospital"; that defendant shall have full "executive management and control"; that the title to all property of the Dubois Hospital Association, and to any new property erected or acquired by the hospital, shall vest in defendant; and that defendant is to be the "sole custodian of the hospital funds." This contract also formally provides that the hospital shall be "nonsectarian," opening its doors to all alike without distinction as to creed, color or race; that defendant shall be "aided in all matters of moment" by the "advice and coöperation" of the "trustees of said hospital"; that defendant's books, "containing the accounts of the hospital funds." shall be "open to an auditing committee of the board of directors of such hospital"; and that the "board of trustees of said hospital association" shall have "supervising" control of the hospital, "subject, however, to the terms of this agreement"; but these provisions do not change the fact that the appropriation here in question is made to help what in substance is an institution under direct sectarian control.

We cannot but see that the arrangement before us is nothing more nor less than a plan to evade the Constitution. No doubt the plan was honestly conceived, in the belief that it was permissible and would prove effective; but this makes it none the less a legal subterfuge. The pruning knife of the law eliminates all such devices, and lays bare the realities of the situation, with which we must deal; these show the hospital named in the appropriation act to be under the control of a well known,

much respected, religious order, and the state's money cannot be permitted to go through the agency of the hospital association to this sectarian institution, since it falls within the class to which that character of recognition is forbidden by the Constitution.

The last appropriation we must consider is to the Jewish Hospital Association of Philadelphia, a Pennsylvania corporation whose charter contains the following preamble: "Since there is no institution now in existence within the State of Pennsylvania under the control of Israelites wherein they can place their sick, and where these can enjoy during their illness all the benefits and consolations of our religion, we, the subscribers and our successors, associate ourselves, etc."

The defendant association, which owns the property occupied by, and controls what is popularly known as, the Jewish Hospital, is confined to persons of the "Jewish faith"; but neither the chief physician nor the chief nurse is a Jew. The great body of the patients are outside that faith, and none of them is obliged to attend religious ceremonies or worship of any kind. The fact remains, however, that this hospital is a sectarian institution according to the sense in which that term is used in the Constitution.

The establishment under consideration is one of the noble contributions of the Israelites of Philadelphia to the cause of charity; but it falls within the broad meaning of the term "sectarian," as that word is understood by the people generally. The Jews are commonly believed to constitute a distinct religious body, or sect, and to all such bodies, whether Christian or otherwise, our organic law forbids the legislature to give recognition by the appropriation of public funds to their charitable, educational or benevolent institutions; hence this appropriation, like the others, must fall.

There can be no doubt that all the institutions at bar are worthy charities; but it is equally clear they are within the inhibited class, so far as state aid is con-

cerned. We did not write the Constitution; but, whether agreeing with or dissenting from the rules of public policy there announced, our sworn duty is to enforce them. Those who adopted the restriction against appropriating money to sectarian institutions must change the rule, if desired, either through an amendment to the present Constitution or by making a new one; neither the legislature, acting alone, nor the courts have power so to do.

We are always loath to put a construction on legislation which shows it to be invalid (Miller v. Belmont P. & R. Co., 268 Pa. 51, 62); but, if constitutions are to command general respect and obedience, the people must know that their courts will constantly endeavor to interpret them according to the commonly accepted understanding of the words used therein; and, when this rule is applied to the facts before us, the result is inevitable.

The decrees appealed from are all reversed, the records are remitted to the court below with directions to reinstate the bills and grant the relief prayed for; the costs to be paid by the several corporations named as defendants.