## Busser et al. v. Snyder, Treasurer of the Commonwealth, et al.

*Constitutional law—"Old Age Commission"—Act of May 10, 1923—Constitutionality—Constitution, art. iii, sect. 18.*

1. The Act of May 10, 1923, P. L. 189, providing for the creation of an "Old Age Assistance Commission," making an appropriation thereto, and creating the machinery by which the commission may pass the money on to the persons found entitled to such benevolence, is unconstitutional, as being an appropriation for benevolent purposes within the prohibition of section 18 of article iii of the Constitution.

2. The fact that the appropriation is made through an agency of the State, created by the act for the purpose, does not change its essential character as a benevolence to the persons to be benefited.

3. The benevolences of the act are not based upon pauperism or lack of earning power, and the act cannot be sustained as a poor law.

Demurrer to bill in equity. C. P. Dauphin Co., Equity Docket, No. 763.

*Ira Jewell Williams*, for plaintiffs.

*George W. Woodruff*, Attorney-General, and *Philip S. Moyer*, Deputy Attorney-General, for defendants.

HARGEST, P. J., Aug. 4, 1924.—The plaintiffs, forty in number, being both persons and corporations, averring that they are citizens, residents and taxpayers of the Commonwealth, brought this bill in behalf of themselves and other citizens and taxpayers who may become parties, against the State Treasurer, the Auditor General, the Old Age Assistance Commissioners of the Commonwealth, and the Old Age Assistance Superintendent of the Commonwealth, to enjoin the enforcement of the Act of May 10, 1923, P. L. 189, on the ground that the same is unconstitutional and void. The defendants demurred.

The act provides for an "Old Age Assistance Commission" of three persons to be appointed by the Governor, which commission shall appoint an Old Age Assistance Superintendent. Each county is required to establish a "County Old Age Assistance Board," to consist of three persons, and the board may appoint one or more local investigators. Section 7 provides: "Subject to the provisions and under the restrictions contained in this act, every person while residing in the Commonwealth shall be entitled to assistance in old age."

Section 8 provides: "The amount of assistance shall be fixed with due regard to the condition in each case, but in no case shall it be an amount which, when added to the income of the applicant from all other sources, shall exceed a total of $1 a day."

Busser et al. *v.* Snyder, Treasurer of the Commonwealth, et al.

Assistance may be granted only to an applicant who has attained the age of seventy years or upwards and been a citizen of the United States for fifteen years, who has resided in the Commonwealth for fifteen years immediately preceding the application, subject to certain allowances for absence; or if there has been forty years' residence, at least five must have immediately preceded the application. One otherwise qualified cannot receive assistance if, at the date of making application, he is an inmate of a prison, jail, workhouse, insane asylum or public reform or correctional institution; has for six months or more during the fifteen years deserted his wife, or without just cause failed to support her and his children under the age of fifteen years; or, if a wife, has deserted her husband or failed to support her children whom she is bound to support; has been a professional tramp or beggar within one year; has a child or other person responsible, under the law, and able to support him.

Assistance is not granted to a person who has more than $3000, or, if married, when the value of the property of husband and wife together exceeds $3000. Upon the death of the person receiving assistance, the total amount paid as assistance, together with interest at 3 per cent., is to be deducted from his estate and paid into the Treasury of the Commonwealth. When the commission deems it necessary, it may require as a condition to the grant of assistance that all or any part of the property of the applicant be transferred to the commission to be managed by the commission, which shall have complete control over the property and defend or prosecute suits concerning it.

Section 15 provides, among other things: "The commission shall decide upon the application and fix the amount of the pension, if any, and its decision shall be final."

The commission issues a certificate good for one year, stating the amount which may be paid monthly or quarterly, which may be canceled if the recipient becomes possessed of any property or income in excess of the amount allowed by the act. Funeral expenses to any recipient are allowed, not to exceed $100. Section 36 makes an appropriation of $25,000 for the purpose of carrying out the provisions of the act.

Section 18 of article III of the Constitution of Pennsylvania provides: "No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association."

In determining its constitutionality, a statute must be construed in every possible way to sustain it, and every presumption is to be indulged in favor of it: Sinking Fund Cases, 99 U. S. 700, 25 Law Ed. 496; Mugler *v.* Kansas, 123 U. S. 623, 31 Law Ed. 205.

A statute will be declared unconstitutional only "when it violates the Constitution clearly, palpably, plainly and in such a manner as to leave no doubt or hesitation in the mind of the court:" Sharpless *v.* Philadelphia, 21 Pa. 147, 164; Pennsylvania R. R. Co. *v.* Riblet, 66 Pa. 164.

"The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. . . . The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon powers of right, reason and expediency with the law-making power:" Com. *v.* Moir, 199 Pa. 534, 542.

"It is no part of our business to discuss the wisdom of this legislation. However vicious in principle we might regard it, our plain duty is to enforce

it, provided it is not in conflict with the fundamental law:" Scowden's Appeal, 96 Pa. 422; Com. v. Moir, 199 Pa. 534; Com. v. McCloskey, 2 Rawle, 369; Com. v. McWilliams, 11 Pa. 61.

"However clear our convictions may be that the system is pernicious and dangerous, we cannot put it down by usurping authority which does not belong to us. . . . The Constitution has given us a list of the things which the legislature may not do. If we extend that list, we alter the instrument, we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature possibly could. If we can add to the reserved rights of the people, we can take them away; if we can mend, we can mar; if we can remove the landmarks which we find established, we can obliterate them; if we can change the Constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely:" Black, C. J., in Sharpless v. Philadelphia, 21 Pa. 147, 159, 161.

So, whether or not this legislation is beneficial or whether it is paternalism and a vicious usurpation by the Government of a quasi-fatherly relation to the citizen and his family, such as is discussed in State v. Switzler, 143 Mo. 287, 322, 323, 45 S. W. Repr. 245, cannot concern us. Our single inquiry must be whether it is prohibited by the Constitution itself. It is with these principles in mind that we approach the consideration of this question.

The Constitution does not in terms prohibit pensions. It prohibits appropriations "for charitable, educational or benevolent purposes, to any person or community," but permits "pensions or gratuities for military services." So it is clear that the words "charitable, educational or benevolent purposes" were understood by the people to include "pensions or gratuities," otherwise they would not have provided for the exception. The question before us is, therefore, whether the old age assistance provided by this statute involves an appropriation for charitable or benevolent purposes and whether the prohibition "to any person" includes a prohibition to a class of persons through the agency of a commission.

"The Constitution is to be understood as using words in their general and popular sense:" Keller v. Scranton, 200 Pa. 130; Com. v. Snyder, 261 Pa. 57, 69; Collins v. Kephart, 271 Pa. 428, 434; Pittston Township School District v. Dupont Borough School District, 275 Pa. 183.

The words of that instrument are used "as the people who voted for it would understand them:" Long v. Cheltenham Township School District, 269 Pa. 472.

"In ascertaining what the Constitution means, we must not look beyond the Constitution itself, unless the language is so ambiguous that we need to ascertain what mischief is to be remedied:" Sharpless v. Philadelphia, 21 Pa. 147; Cooley's Constitutional Limitations (7th ed.), 101.

"We cannot try the constitutionality of a legislative act by the motives and designs of the lawmakers, however plainly expressed:" Pennsylvania R. R. Co. v. Riblet, 66 Pa. 164; Com. v. Moir, 199 Pa. 534, 543. Therefore, little attention can be paid to the fact urged by plaintiffs' counsel, that one of the members of the House of Representatives argued that this act was for the purpose of making it "possible for old men and old women to live happily together."

Nor can we rest our judgment upon the speeches of the members of the Constitutional Convention, as argued by counsel for defendants.

"While the speeches of the members of the convention may occasionally throw light on obscurity, they cannot be used to distort the obvious meaning of the language they adopted in the instrument framed. Were we, in inter-

pretation of the Constitution, to resort to the convention debates as our guide, we would find too much of our time taken up in interpretation of speeches of members instead of devoting it to the language of the written instrument:" Weigold *v.* Pittsburgh, etc., R. R. Co., 208 Pa. 81, 85.

Legislation of this character is a novelty in this country. Such pension laws have been in force in New Zealand since 1898, and in Great Britain and Australia since 1908, where no constitutional provisions hamper their enforcement. Apparently only three states, Nevada, Montana and Pennsylvania, have old age pension laws, all passed in 1923. So that we have no decisions for our guidance.

Does this act provide for an appropriation for a charitable or benevolent purpose? These laws are called "Old Age Pension Laws." See American Bar Association Journal, February, 1924, page 109. The draftsman of the act, apparently thinking that there was some danger in the term "pension," used the term "assistance," except in section 15, where he provided that the commission shall "fix the amount of the pension, if any."

"Charity" means "liberality to the poor; the spirit of charitable giving; benevolence; . . . that which is given to relieve the needy; any act of help to the needy:" Standard Dictionary.

"Benevolent" means "kindly disposed toward others and actively desirous of their well-being; given to benevolence; kindly; generous; charitable. Designed or executed for a charitable end; granted in benevolence; given through love:" Standard Dictionary.

"Having or manifesting a desire to do good; possessing or characterized by love toward mankind, and a desire to promote their prosperity and happiness; kind, as a benevolent disposition or action:" Century Dictionary.

"Benevolent means having a disposition to do good; possessing or manifesting love to mankind, and a desire to promote their prosperity and happiness; disposed to give to good objects; kind; charitable:" State *v.* Dunn, 46 S. E. Repr. 949, 950, 134 No. Car. 663; State ex rel. Attorney-General *v.* Critchett, 32 N. W. Repr. 787, 37 Minn. 13; Foster *v.* Moulton, 29 N. W. Repr. 155, 35 Minn. 458; Gorman *v.* Russell, 14 Cal. 531.

"Benevolent is wider than charitable in its legal signification:" Hegeman's Executors *v.* Roome, 62 Atl. Repr. 392, 393, 70 N. J. Eq. 562; Murdock *v.* Bridges, 39 Atl. Repr. 475, 477, 91 Me. 124; Chamberlain *v.* Stearns, 111 Mass. 267, 268.

In wills "benevolent" and "charitable" are sometimes construed as synonymous: Murphy's Estate, 184 Pa. 310.

This act of assembly provides that, "subject to the provisions and under the restrictions contained in this act, every person while residing in the Commonwealth shall be entitled to assistance in old age," and that the amount of assistance is to be such as will bring the income of the applicant from all sources up to $1 a day.

The money for this purpose is appropriated by the Commonwealth. This certainly is a kindness towards persons in old age. This act manifests a desire to do good; it indicates a love toward mankind; an effort to promote happiness; in fact, it comes within all of the definitions of benevolence. The appropriation must, therefore, be characterized as one for "a benevolent purpose." Is it not within the class of appropriations for "benevolent purposes" which section 18 of article III of the Constitution prohibits? The prohibition is against any appropriation "for charitable, educational or benevolent purposes to any person or community." The Commonwealth argues that recourse ought to be had to the constitutional debates to determine the reason for this

prohibition, and when such recourse is had, it will appear that this provision of the Constitution was to prevent so-called "calamity acts," for the relief of certain persons or communities who suffer by fire, flood and like causes. We understand the Commonwealth's contention also to be that the word "person," in this connection, means the persons in the community affected by a calamity severe enough to move the legislature to grant individual as well as community relief. This contention seems to be based upon the language of Mr. Buckalew, who, in his work upon the Constitution, in which he refers to "calamity acts" (page 89), says: "Such appropriations cannot be made to a body of inhabitants, or to individuals among them, at any time and place."

The constitutional prohibition is against such appropriations "to any person or community." There is no limitation of the words "to any person," so they must be understood as referring only to persons in a community which has suffered some calamity, where charity, or benevolence, would be a worthy thing. To so limit this language would not be construing these words "in their general or popular sense" (Keller v. Scranton, 200 Pa. 130), or "according to their plain, generally understood or popular meaning" (Collins v. Kephart, 271 Pa. 428, 434), or "as the people who voted for it (the Constitution) would understand them:" Long v. Cheltenham Township School District, 269 Pa. 472. The prohibition against appropriations for charitable or benevolent purposes "to any person" means to any person anywhere, and "to any community" means to any community, whether it happens to have been affected by a calamity or a border raid, or any other condition which would induce a charitable or benevolent appropriation. Indeed, Mr. Buckalew, in discussing this section in the same connection, and following the sentence above quoted, says: "The provision is not confined to calamity acts, but its application to them was beyond question a leading object of the convention."

It would hardly be seriously contended that the prohibition, being against an appropriation "to any person," in the singular, does not include the plural and prohibit an appropriation to a number of individuals, either singularly or collectively, as a class.

The defendants also contend that this act does not violate section 18, article III, of the Constitution, because the appropriation is made to a commission which is an agency of the State, for the purpose of the proper distribution to the persons for whom the appropriation is intended, and is not made directly to any person. The Attorney-General, in his brief, says: "Not a syllable in the State or Federal Constitutions forbids the legislature to provide for a system of benevolence through a State department or agency for the care and maintenance of its aged indigent residents."

If we are right in our conclusion that the prohibition for benevolence to any person is as broad as the language plainly indicates, then we say there is not a syllable in the Constitution which authorizes a system of benevolence through a State department or agency, for the care and maintenance of aged indigent residents of the State. This argument is tantamount to saying that the legislature can pass a law to do the thing indirectly which the Constitution prohibits it from doing directly. If appropriations can be made to a commission, the purpose of which is to distribute benevolence to aged indigent persons, it is accomplishing exactly what the Constitution says cannot be done, namely, making an appropriation for benevolent purposes to certain persons.

It has been said many times in judicial decision that the courts must look through the form to the substance, and this applies as well to testing the constitutionality of statutes as to the determination of any other act alleged to be illegal or unconstitutional. The substance and ultimate purpose of this

statute is to make an appropriation to aged indigent persons for benevolent purposes, no matter through what channels the appropriation must first pass. No case better illustrates that the courts will not tolerate an effort to get around the plain provisions of the Constitution by indirection than Collins *v.* Kephart, 271 Pa. 428. In that case certain appropriations were attacked on the ground that they were made to denominational and sectarian institutions, and therefore void, under this very same section of the Constitution. In one instance it was argued that the Passavant Hospital was not a sectarian institution because it had a purely non-sectarian board which could collect and expend the appropriation from the State. Chief Justice von Moschzisker said (page 436) : "It is quite apparent that the creation of the so-called local board represents simply an effort to make the Passavant Hospital appear as though it were not a denominational institution, and thus enable it to obtain State aid; but that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt."

In the case of the Dubois Hospital, the charter indicated no sectarian purpose, but the property occupied by the institution was owned and operated by another corporation, called "The Sisters of Mercy of Crawford and Erie Counties." The Sisters of Mercy operated the hospital on a contract with the hospital association. The contract provided that the hospital should be non-sectarian, but nevertheless it was under direct sectarian control. Of this Chief Justice von Moschzisker said (page 439) : "We cannot but see that the arrangement before us is nothing more nor less than a plan to evade the Constitution. No doubt, the plan was honestly conceived in the belief that it was permissible and would prove effective; but this makes it none the less a legal subterfuge. The pruning knife of the law eliminates all such devices and lays bare the realities of the situation with which we must deal; these show the hospital named in the appropriation act to be under the control of a well-known, much respected religious order, and the State's money cannot be permitted to go through the agency of the hospital association to this sectarian institution, since it falls within the class to which that character of recognition is forbidden by the Constitution."

The logic of the defendants' argument in this case would also lead to the conclusion that if appropriations were made to a commission for the purpose of disbursement to institutions, they might be disbursed to denominational and sectarian institutions, inasmuch as the appropriation was not made directly to the institution, but to an agency of the State. The argument is as sound in the one case as in the other.

We, therefore, conclude that the provisions of this act providing for an appropriation to the Old Age Assistance Commission and creating the machinery by which that commission may pass the money on to the persons found entitled to such benevolence is, notwithstanding the channel through which it passes, forbidden by the Constitution.

Nor can this act be sustained as a poor law. Fundamentally, a state should take care of its paupers. "A pauper is one so poor as to be unable to provide for him or herself and having no one of sufficient pecuniary ability to care for them:" Whiting's Application, 3 Pitts. Rep. 129, 133. This act of assembly is not based entirely upon pauperism or lack of earning power, and has other qualifications which it is not necessary to consider, but which are not consistent with pauperism.

Judge Brewer, who subsequently became a Justice of the United States Supreme Court, said in State ex rel. Griffith *v.* Osawkee Township, 14 Kans.

418, 422: "Cold and harsh as the statement may seem, it is nevertheless true that the obligation of the state to help is limited to those who are unable to help themselves."

Pennsylvania has recognized its inherent duty to care for its poor. Its system had been in operation many years when the Constitution of 1874 was framed. That system provided for poor districts, poor directors and overseers, and for the relief of paupers as a matter of local concern. Those who framed the Constitution understood it, and no word is contained in the Constitution with reference to it. The system was left untouched. If there had been any purpose to change that system, some word indicating that purpose would have been found in the Constitution. If it had been intended that direct appropriations might be made out of the State Treasury for the relief of the poor, some provision evidencing such intention, which would create so radical a change in the governmental policy in this regard, would have been inserted in the Constitution. The conclusion is, therefore, irresistible that a direct appropriation from the State Treasury to any person or class of persons cannot be sustained on the theory that it is a discharge of the inherent obligation of the State to take care of its paupers.

From what we have already said, notwithstanding we have considered this subject in the light of the principles announced in the beginning of this opinion, we are left in no doubt that this statute offends against section 18, article III, of the Constitution, and must, therefore, be declared void.

The plaintiffs contend that the act is unconstitutional as offending against other sections of the Constitution. Upon these other questions we express no opinion, because we are left in no doubt of the correctness of the conclusion already reached.

If we are right in assuming that there are no disputed facts and no occasion for any further hearing, a final decree may be submitted by counsel.

Now, Aug. 4, 1924, the demurrer of the defendants is hereby overruled, the bill of complaint is hereby sustained, and the Act of May 10, 1923, P. L. 189, providing for and creating an Old Age Assistance Commission, is hereby adjudged unconstitutional and void.

From Sidney E. Friedman, Harrisburg, Pa.