## Turner Estate

*William F. Scheid,* for accountant.

. *Nochem S. Winnet,* for The Mary Jones Hearth.

*Thomas M. Schubert,* for St. Regis House for Business Women.

*John Justin McCarthy,* for Dominican House of Retreats and Catholic Guild.

*Louis Marion,* for Commonwealth.

KLEIN, P. J., June 8, 1962.—Julia M. Turner, testatrix, died on May 3, 1960, leaving the residue of her estate in equal shares to the following eight charities: (1) The Queen of Peace House; (2) St. Ignatius Home for Homeless Men; (3) St. Francis Country House for Convalescents; (4) Seeing Eye Dog Training School; (5) Morris Refuge; (6) Animal Rescue League of Philadelphia; (7) The Little Sisters of the Poor of Philadelphia; and (8) The Salvation Army.

An account was filed by the executors. which came on for audit on May 1, 1961, at which time counsel for the accountants stated that they had been informed by the Cathedral Office of the Roman Catholic Church, 1700 Summer Street, Philadelphia, that the Queen of Peace House was no longer in existence and suggested that the residue be divided in equal one-seventh shares among the other residuary legatees, all being charities. Relying upon the authority of Zuck Estate, 33 Erie 237 (1950); Brooks Estate, 2 Fiduc. Rep. 57 (1952) and Dougherty's Estate, 25 Dist. R. 1111 (1916), the auditing judge, in an adjudication dated May 18, 1961, refused to follow the accountants' suggestion and awarded seven-eighths of the residue to the seven charities still in existence and awarded the one-eighth share bequeathed to Queen of Peace House back to the accountants for further accounting. The fund so awarded is the fund presently accounted for.

By decree dated November 17, 1961, Theodore B. Smith, Jr., was appointed amicus curiae, with the powers of a master, to assist the court in determining the manner in which this one-eighth share should be distributed.

The master, after giving proper notice to interested parties, held four hearings at which testimony from the various claimants was received. On April 19, 1962, the master filed a report in which he recommended that the one-eighth share bequeathed to the Queen of Peace House be awarded in equal shares to Dominican House of Retreats and Catholic Guild and St. Regis House for Business Women.

Exception was taken to this recommendation by The Mary Jones Hearth, a non-sectarian, non-profit corporation, organized in 1952, which operates a home at 536 Pine Street, Philadelphia, where it provides temporary shelter for women, without regard to race, color or creed.

Julia M. Turner, testatrix, was a member of the Alliance of Catholic Women of the Archdiocese of Philadelphia, which was an unincorporated association of lay women of the Roman Catholic faith, engaged in promoting the practice of Christian charity and the extension of Christian education. The Regina Pacis (Queen of Peace) House was established by the Alliance for the purpose of providing temporary shelter in a decent place with necessary moral protection for friendless girls and women, who during the World War I period came to Philadelphia in great numbers from many small towns to secure employment. Although women were admitted to the Queen of Peace House regardless of their race, creed or color, it was clearly a sectarian charity. The home was founded, financed and operated by Roman Catholics and one of its essential purposes was to provide a home under Roman Catholic auspices where Catholic girls could perform their religious duties in proper spiritual surroundings.

The home was opened on March 25, 1917, and closed on September 30, 1945, with the approval of the Archbishop. The guests who were in the home at the time it closed were transferred to the Dominican Convent (now known as Dominican House of Retreats and Catholic Guild) and the Boarding Home of the Sisters of Mercy (now known as St. Regis House for Business Women). Arrangements were also made that all worthy persons who might apply for shelter thereafter would be cared for in these two institutions, both being in Philadelphia and operated under Roman Catholic auspices.

We are in full agreement with the conclusions of the master that the two institutions he has selected more closely approximate the functions of the defunct Queen of Peace House than does The Mary Jones Hearth, the exceptant. The fact that the people who

created and operated the Queen of Peace House transferred its operations to the two institutions selected by the master furnishes very persuasive evidence that the master has exercised good judgment in his recommendation.

But even if it were conceded, for the sake of argument, that the work of the Hearth approaches as closely that of the Queen of Peace House as does that of the two charities selected by the master, the auditing judge is strongly of the opinion that preference must be given to the two sectarian Roman Catholic institutions which the master has chosen.

The doctrine of cy pres is one of approximation. It cannot be approached as if it were in the nature of an exact science. Each case is sui generis and depends upon its own attending circumstances.

In applying the cy pres doctrine the court exercises its discretion in such a manner as to award the fund to an eleemosynary institution, whose services it believes most nearly approximate the intention of the donor: Women's Homoeopathic Hospital of Philadelphia Case 393 Pa. 313 (1958); Restatement, Trusts, §399; Estates Act of April 24, 1947, P. L. 100 sec. 10. In ascertaining the donor's intention, serious consideration must be given not only to the religious affiliations of the donor, but also of the donee, if it is maintained under sectarian, religious auspices.

Although the origins of the cy pres doctrine are lost in antiquity, it is well known that early chancery law developed under ecclesiastical influences and most gifts were made for religious purposes. Bogert in his masterful work on Trusts and Trustees, Vol. 2A §431, states at page 319:

" . . . the early gifts to charity were regarded by chancery as made in expiation of sin and as a means of insuring to the donor a state of happiness after

death. If the exact scheme for securing pardon and an eternal period of bliss for the soul failed for any reason, it was natural that chancery, with its ecclesiastical tinge, should think that the testator would have desired the substitution of any other plan which would bring about the same result as the original gift."

There is also a strong tendency historically for each religious group to establish and maintain charitable institutions under its own supervision to serve not only the needs of its own members, but those of the general public, as well. Accordingly, the various major religious groups, Catholics, Protestants and Jews, maintain their own systems of schools, orphanages, hospitals, homes for the aged and infirm and institutions serving other charitable purposes. This is also true of the various Protestant sects and denominations. Thus, Methodists, Baptists, Presbyterians, Lutherans, Episcopalians and many others operate their own separate charities within the Protestant fold. It follows naturally, therefore, that devout people will favor charities which are under the auspices of their own denominations.

The religious preferences of deceased benefactors should be respected and honored whenever possible. If a gift is given to an institution conducted by a sectarian religious group, as in the present case, the fund should not be transferred to an institution conducted by a different religious faith, or by a non-sectarian group, unless there is no possibility of practically carrying out the donor's intention through an agency of the religious denomination he has designated.

In the present case, testatrix divided her estate among eight varied charities whose works covered a broad area of Christian benevolence. Some were completely non-sectarian in nature; others were maintained by sectarian religious groups. The legacy to the Queen of Peace House was in the latter category.

We must regard each legacy as a separate and independent gift and endeavor to preserve its sectarian character, if possible. The right of an American citizen to contribute his money to charities of his choice, including those which promote purely sectarian religious purposes, is one of his cherished rights as a free man. This right must not be invaded or diluted.

In Pennsylvania a sharp distinction is drawn between charities which, although completely non-sectarian in the services they perform, are operated under sectarian auspices, and those which are non-sectarian both in management and service. Article III, sec. 18, of the State Constitution prohibits appropriations for charitable, educational or benevolent purposes "to any denominational or sectarian institution." The courts have construed this provision to mean that an institution which, by its charter, is under the direction of a sectarian group, is ineligible to receive State aid, even though its facilities are made available to all persons without distinction as to creed, color or race. See Collins v. Kephart, 271 Pa. 428 (1921); Constitutional Defense League v. Waters, 308 Pa. 150 (1932).

As a consequence of this governmental preference for purely non-sectarian charities in this State, justice and fairness dictate that the courts, in the application of the cy pres doctrine, exercise great caution before they divert a gift, originally given to a sectarian charity ineligible to receive State aid, to a non-sectarian charity which is not so barred from receiving assistance from the State.

Julia M. Turner, testatrix, was a Roman Catholic. The Queen of Peace House was a Catholic charity, having been founded and maintained under Roman Catholic auspices. Under the circumstances of this case, we will not divert her benevolence to a non-sectarian charity.

The report of the amicus curiae is accordingly approved and its recommendations are adopted by the auditing judge, with the exception of the suggested limitation imposed upon the award by the amicus curiae. The original gift to Queen of Peace House in testatrix' will contained no limitations or restrictions as to the use of the fund by the donee. In view of the limited size of the fund to be awarded equally to Dominican House of Retreats and Catholic Guild and St. Regis House for Business Women, the auditing judge is of the opinion that, instead of restricting the use thereof as recommended by amicus curiae, the donees should be required only to place appropriate plaques in their buildings to memorialize the gift, the size and design of such memorials to be submitted to the auditing judge for his approval before same are installed.