## Collins v. Martin, Auditor General, et al.

*Constitutional law—Appropriations—Payments to denominational or sectarian institutions.*

1. A contract made between the Department of Welfare of the Commonwealth of Pennsylvania and a denominational or sectarian institution for the *per diem* payment for services rendered in the care and treatment of the sick and injured violates article iii, section 18, of the Constitution, which forbids the making of any appropriation "for charitable, educational or benevolent purposes . . . to any denominational or sectarian institution, corporation or association."

2. The appropriation made by the Act of April 13, 1925 (Appropriation Act, Session of 1925, page 159), cannot be used by the Department of Welfare to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, where such treatment has been in denominational or sectarian institutions.

3. The execution of a contract by the Secretary of Welfare and a hospital creates no different relation than that which exists between the Commonwealth and those hospitals which have received direct appropriations.

4. The effect of such a contract is in no way similar to the purchase of any service or commodity by the Commonwealth; it is the purchase of charity, education or benevolence from a sectarian institution which is prohibited.

5. The Department of Welfare has no discretion by which it can pay a sectarian institution for charitable and benevolent services rendered.

6. Where a Roman Catholic society incorporated for "the establishment of schools for the education of youth and the erection of hospitals for the care of the sick," builds a hospital with its own funds and financially administers and controls such hospital, payments of State moneys cannot be made to such society for services rendered in caring for and treating the sick in the hospital.

7. In such case, it is immaterial that the society established an advisory board in which certain members were non-Catholics, if it appears that such board had no power in directing the finances or policy of the hospital, and no power whatever to perform a contract entered into on its behalf.

Bill in equity for injunction. C. P. Dauphin Co., Equity Docket, 1925, No. 802.

*Geo. Ross Hull* and *J. S. Levin,* for plaintiffs.

*Wm. A. Schnader,* Deputy Attorney-General, *F. S. Brown, J. P. Gaffney* and *D. C. Donoghue,* for defendants.

WICKERSHAM, J., Sept. 15, 1926.—The plaintiff seeks to restrain the defendant, Edward Martin, Auditor General of Pennsylvania, from approving the bill of St. Agnes Hospital of Philadelphia, in the amount of $10,532.57, being for approximately 3510 net days of free hospital service at $3 per day, supplied by the said hospital under a contract made with the Department of Welfare of the Commonwealth of Pennsylvania dated Sept. 21, 1925, wherein, *inter alia,* the Commonwealth agreed to pay for, and the Board of Trustees of St. Agnes Hospital of Philadelphia agreed to furnish, such free service at the rate of $3 *per diem* for medical and surgical treatment rendered to and in maintenance of each person treated in said hospital who is entitled to free service, etc.; also to restrain the defendant, Samuel S. Lewis, State Treasurer of Pennsylvania, from paying said bill; and to restrain the defendant, The Sisters of St. Francis of Philadelphia, from receiving the said sum, for the reason that the act of assembly, known as Act No. 282 *a,* approved by the Governor of Pennsylvania April 13, 1925—see Appropriation Acts, Session of 1925, page 159—appropriating the sum of $1,000,000 to the Department of Welfare to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, is unconstitutional and void.

Answers were filed denying the material allegations of the bill of complaint.

After carefully considering the evidence, oral and documentary, we find the following

## Facts.

1. H. Reisert and Peter Donawitz, the intervening plaintiffs, are, each of them, citizens and residents of the State of Pennsylvania, and each of them pays taxes into the State Treasury of the Commonwealth of Pennsylvania.

2. Edward Martin is Auditor General and Samuel S. Lewis is State Treasurer of the Commonwealth of Pennsylvania; and the Sisters of St. Francis of Philadelphia is a corporate institution of said Commonwealth of a charitable, benevolent or educational nature.

3. By an Act of Assembly approved April 13, 1925, the Legislature of Pennsylvania appropriated to the Department of Welfare the sum of $1,000,000, to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, for and during the two years from June 1, 1925, to May 31, 1927.

4. Under date of Sept. 21, 1925, the Secretary of Welfare entered into a written agreement which purported to be executed by the Board of Trustees of St. Agnes Hospital of Philadelphia, and sealed with the seal of St. Agnes Hospital, but which was, in fact, signed by Mother Mary Kilian, who was president of the Sisters of St. Francis of Philadelphia, and attested by Sister Mary Hiltrudes, who was secretary of the Sisters of St. Francis of Philadelphia.

5. No formal action was taken by the Advisory Board of St. Agnes Hospital approving or disapproving of this agreement or authorizing any one on its behalf to execute the same, and there is no evidence that it was ever presented to said advisory board for its consideration. St. Agnes Hospital of Philadelphia has no board of trustees.

6. By this agreement the Secretary of Welfare undertook to purchase from St. Agnes Hospital of Philadelphia, Pa., during the year ending June 1, 1926, 8500 days of hospital service for the indigent sick and injured who are qualified to receive such service under the rules and regulations of the Department of Welfare, and St. Agnes Hospital agreed to accept payment for the same at the rate of $3 per diem for each person treated who is entitled to free service, and a proportionate amount thereof for each part-pay patient; provided, that in no case should the hospital receive compensation at a rate exceeding the actual cost of service per capita in the public ward of said hospital. The hospital agreed to keep certain accounts and records in accordance with the rules of the Department of Welfare. The Secretary of Welfare reserved the right to cancel this agreement if certain standards of service were not maintained by the hospital; and reserved the right unconditionally to increase or decrease at any time the number of per diem days provided for by the agreement.

7. In determining the number of days of hospital service to be included in said agreements, the Secretary of Welfare intended to reimburse said hospital to the extent of approximately 80 per cent. of the amount expended by it in free service to the indigent sick and injured.

8. Said written agreement was entered into without any regard as to whether the said hospital executing it was sectarian or non-sectarian in character.

9. The Commonwealth of Pennsylvania has not taken over and does not conduct, manage and control as a governmental function or activity the support, care and treatment of indigent sick and injured in medical and surgical

hospitals. It owns, operates and controls ten State hospitals which render such service, all of which are located in the coal fields of Pennsylvania. Excepting for the conduct of these hospitals, the activities of the Commonwealth are confined to the supervision of other hospitals and the assistance of such hospitals by the appropriation of money.

10. St. Agnes Hospital is conducted by the Sisters of St. Francis, of the patronage of His Eminence, Dennis Cardinal Dougherty, D. D., Archbishop of Philadelphia.

11. It was managed, as appears from the biennial report, from Jan. 1, 1923, to Dec. 31, 1924, by Superior General, Mother Mary Kilian, O. S. F.; Superintendent, Sister Mary Georgina, O. S. F. Staff Officers: President, Dr. William J. Taylor; Vice-President, Dr. John A. McGlinn; Secretary, Dr. Eugene C. Murphy; Treasurer, Dr. Leonard Averett. Advisory Board: Sister Mary Georgina, O. S. F., Dr. J. William Bransfield, Chairman, Dr. George M. Dorrance, Dr. John Cooke Hirst, Dr. Charles J. Hoban, Dr. John O'Connell, Secretary.

12. There is a Roman Catholic chapel in the hospital in which a priest of St. Thomas conducts services every morning. Prior to two years ago, Father O'Neill was the chaplain of the hospital. This priest from St. Thomas comes to the hospital every evening and remains over night.

13. Sister M. Georgina, of the Sisters of St. Francis, an organization of the Catholic Church, is superintendent of the hospital. She was appointed to this position by the Mother Superior.

14. Ten of the graduate nurses are Sisters of St. Francis and have charge of every floor. The pupil nurses are under the control and supervision of a Sister of St. Francis. The sister nurses wear the garb of their religious order.

15. The Official Catholic Directory of Philadelphia Archdiocese for 1925, page 100, contains the following: "*Hospitals.* Philadelphia. St. Agnes Hospital, Broad and Mifflin Streets (Oregon 0171). Opened May 15, 1888. 30 sisters of the Third Order of St. Francis Assisi. Sister Mary Georgina, superior. . . . Attended by the priests of St. Thomas Aquinas Church."

16. The Directory of Catholic Charities in the United States, page 302, contains the following: "*St. Agnes Hospital,* 1900 South Broad Street. (1888) General. 320 beds, dispensary, clinics, social service department with two social service workers, and a training school for nurses, with 75 students. Sisters of St. Francis."

17. The Official Catholic Directory, 1925 edition, page 179, under the subhead "*Hospitals,*" contains the following: "St. Agnes Hospital, Broad and Mifflin Streets (Oregon 0171). Opened May 15, 1888. 29 sisters. Sisters of the Third Order of St. Francis Assisi. Sister Mary Georgina, superior. . . ."

18. The information contained in these Catholic directories was furnished to them by Sister Georgina, styled in the biennial report of St. Agnes Hospital as "superintendent."

19. On Oct. 11, 1922, Sister Georgina, the directress of the hospital, appointed an advisory board for a term of one year, beginning Oct. 1, 1922, consisting of five members, to wit, Drs. Dorrance, Hoban, Hirst, Bransfield and Fanz.

20. The minutes of the board prescribed their duties as follows: "The five members above named and duly appointed for the term of one year are to hold regular informal meetings, weekly, if occasion requires, to discuss matters pertaining to hospital efficiency, management, appointment of internes, problems in economics, hospital supplies, the adjustment of disputes between

internes—internes and chiefs, etc.; and to give help and explanation in technical matters to the directress, thereby assisting her in the discharge of her duties as medical directress. By agreement of the medical members and Sisters Georgina and Laurentina, decisions rendered are final, incontroversial."

21. Of this board of five medical directors, three were Catholics, two non-Catholic, and this proportion has been maintained.

22. The Sisters of St. Francis own the building in which St. Agnes Hospital is operated.

23. There is no corporation in existence having the name of St. Agnes Hospital. There is no person, corporation or association in existence which is legally competent to perform the written agreement heretofore referred to, except the Sisters of St. Francis.

24. There is no contract or agreement between the Sisters of St. Francis of Philadelphia by which any power or authority to manage, control and operate St. Agnes Hospital has been vested in the advisory board.

25. No lease has been executed between the Sisters of St. Francis of Philadelphia, the owners of the property, and the advisory board, or any one else, by which the advisory board or any one else is granted the right to occupy the hospital property.

26. Neither the advisory board nor any one else pays any rent for the use and occupancy of the hospital property.

27. No person or corporation other than the Sisters of St. Francis of Philadelphia have or exercise any control over the advisory board. The advisory board, the hospital staff and all other persons who occupy the hospital property occupy the same at the sufferance of the Sisters of St. Francis of Philadelphia, and their use and occupancy is subject to the control, domination and governing influence of the Sisters of St. Francis of Philadelphia, whenever said sisterhood may choose to exert the same.

28. The Sisters of St. Francis of Philadelphia is a corporation, not for profit, which was incorporated by the Court of Common Pleas of Philadelphia on Sept. 30, 1869. The objects of the corporation, as stated in its charter, are "the establishment of schools for the education of youth and the erection of hospitals for the care of the sick."

29. Said charter further provides "that no person shall be or remain a corporator except regular professed members of the religious society called Sisters of St. Francis."

30. All of the officers and members of the Sisters of St. Francis of Philadelphia must be professed members of the Roman Catholic religion.

31. The Sisters of St. Francis of Philadelphia and St. Agnes Hospital are, each of them, sectarian or denominational institutions, corporations or associations, as contemplated in article III, section 18, of the Constitution of Pennsylvania.

## *Discussion.*

Two essential questions present themselves for our consideration:

1. Is St. Agnes Hospital, as now and heretofore conducted, a sectarian or denominational institution, corporation or association; and

2. Does the payment of the *per diem* compensation by the Secretary of Welfare to St. Agnes Hospital, under the contract heretofore referred to, offend against and come within the inhibition of article III, section 18, of the Constitution of Pennsylvania?

These two questions are controlling and all others raised by the pleadings, evidence and briefs of counsel are collateral thereto.

Collins *v.* Martin, Auditor General, et al.

We have found as a fact that St. Agnes Hospital, as now and heretofore conducted, is a denominational or sectarian institution as contemplated by section 18 of article III of the Constitution of Pennsylvania. We think our conclusion is supported and sustained by the great weight of the evidence. We judge the sectarian character of an institution by what it does or by what it says about itself.

What do the managers of St. Agnes Hospital say? Subsequent to Dec. 31, 1924, St. Agnes Hospital published its biennial report for the two preceding years. On the inside of the cover we find the following form of "*bequest:*" "I give, devise and bequeath unto 'The Sisters of St. Francis of Philadelphia' (here mention the amount or character of the bequest), to be applied by them to the maintenance, support and benefit of the St. Agnes Hospital, situated in the City of Philadelphia." On the first page, frontispiece, we find a photograph of His Eminence, Dennis Cardinal Dougherty, D. D. The report is entitled, "Biennial Report of St. Agnes Hospital, Broad and Mifflin Streets, Philadelphia, Pa., conducted by the Sisters of St. Francis, under the Patronage of His Eminence, Dennis Cardinal Dougherty, D. D., Archbishop of Philadelphia." On page 2 is a photograph of the hospital, and on page 3, as managers of the hospital, we find "Superior General, Mother Mary Kilian, O. S. F.; Superintendent, Sister Mary Georgina, O. S. F.," and then follows the staff officers and the advisory board. The evidence shows that this board was appointed on Oct. 11, 1922, by *Sister Mary Georgina*, O. S. F., who is a member of the Sisters of St. Francis. The evidence further shows that of the five medical members of the advisory board, three are Catholic and two non-Catholic.

The hospital contains a chapel in which religious services of the Roman Catholic faith, conducted by a priest of St. Thomas, are held every morning. The photograph shows that this chapel is equipped as a Roman Catholic Church, and no other services are held in this chapel except those of the Roman Catholic religion. While it is true that ministers of other denominations are permitted to visit their parishoners when in the hospital, and no one not a Catholic is required to attend mass at six o'clock in the morning of each day, it is also true that no religious services are held by any other denomination within the hospital.

The historical items contained on pages 26 to 29, inclusive, of this report describe exercises held in the chapel by Catholic priests and organizations; for example, on June 7, 1923, it appears that sixteen young ladies were graduated from the St. Agnes Hospital School for Nurses. "A successful lawn fête was conducted on the hospital grounds under the auspices of the Sisters of St. Francis, assisted by the Ladies' Auxiliary and St. Monica's Club." On May 25, 1922, we find the following: "Nurses Home formally opened and blessed by His Eminence, D. Cardinal Dougherty, in connection with the nurses' commencement;" and on May 17, 1924, it appears "thirty-six young ladies received the diploma of graduation from the hands of His Eminence. The day was a memorable one, since, on this occasion, a portrait of His Eminence, Cardinal Dougherty, was unveiled and placed over the main entrance to the hospital. The Rt. Rev. Msgr. Nash delivered an appropriate address and Masters McGlinn, O'Connell, Keegan and Doyle were attendants of His Eminence. Death of our beloved chaplain, the Rev. Cornelius J. O'Neill."

A photograph of the men's medical ward, between pages 30 and 31, shows a crucifix on the wall. On page 45 of the report it appears that the "pharmacy in charge of Sister Mary Avellina is likewise a very active unit of the dispensary." On page 48, Dr. Alfred S. Doyle, M. D., roentgenologist, reports

as follows: "The following is the report which I respectfully submit to the *Sister Superior, Medical Staff* and friends of the hospital;" and, on page 49, he continues: "I also wish to thank the Sisters of St. Francis, members of the staff, friends and my assistant, Dr. A. Silverman, for the support which I have received in the past." A photograph between pages 50 and 51 of the Necropsy Department shows a crucifix on the wall.

We also quote from the report of John A. McGlinn, M. D., member of the School of Nursing Committee, on pages 54 and 55: "Those of us who know, marvel at the courage and foresight of Sister Georgina in bringing this magnificent edifice into being. It will be a lasting monument of her devotion to St. Agnes Hospital. . . . Apart from all the opportunities that our nurses enjoy, noteworthy is their privilege of making a Retreat of three days annually. The spiritual exercises are conducted in three sections, so that the patients suffer no lack of care and attention during this time, and each nurse may give her thoughts absolutely to the interests of her soul. The principal event in 1924 was the graduation exercises held Thursday, May 15th. The exercises were particularly noteworthy, as a portrait of His Eminence was unveiled. . . . The graduates attended a Solemn High Mass, celebrated in the *hospital chapel* at 9 o'clock on Commencement Day. The baccalaureate sermon was delivered by the Rev. Daniel J. M. Callaghan, S. J., of Georgetown University." In this address Father Callaghan is reported as saying (see page 45) : "The Sisterhood of St. Francis was founded not many decades ago by one whose cause for beatification is now before the Holy See, the Venerable Bishop Newmann. Wherever the Sisters of St. Francis have gone they have flourished, have produced fruit and their fruit will remain.' At the conclusion of the exercises His Eminence blessed the graduates and their assembled friends."

On page 69 of this report, relating to the requirements for admission to the School of Nurses, it appears: "The Sister Superior of the hospital and the Superintendent of Nurses will determine as to their fitness for the work and the propriety of accepting or rejecting them;" and the report concludes with this sentence on page 70: "*The religious services of the hospital are those of the Roman Catholic Church.*"

And this is what the management of St. Agnes Hospital says about itself. Some evidence was produced by one of the medical staff to show that these statements were "*a mistake*," yet Sister Georgina testified that information given by her for publication was given "through the *Advisory Board*" (N. T., page 83). How, then, could there have been a mistake in the statements contained in said publication? Furthermore, Sister Georgina testified (N. T., page 84: "There is nothing printed without we have the knowledge of it." The testimony of Mother Mary Kilian, regarding her connection with the management of the hospital, is enlightening, and conclusively shows no mistake was made in the statement of said management of the said St. Agnes Hospital, as found on page 3 of the biennial report thereof, Exhibit No. 9 (N. T., page 58). It nowhere appears in the minutes that these statements were repudiated, nor were they repudiated in court until their full import became apparent to counsel for the defendants. It also appeared from the evidence that St. Agnes Hospital is listed as a Roman Catholic institution in the Directory of Catholic Charities of the United States, published by Rev. John O'Grady, Ph. D., Exhibit No. 15, page 302; also in the Official Directory of the Philadelphia Archdiocese of 1925, published by the Catholic Standard and Times of Philadelphia, page 100; and also in the Official Catholic Directory, complete edition, 1925, page 179.

Collins *v.* Martin, Auditor General, et al.

It is contended by counsel for the defendant that the defendant, the Sisters of St. Francis, divested itself of the management of said hospital by the creation of the advisory board, or, as it was stated by one of counsel during the trial, the Sisters of St. Francis turned over the entire management of the hospital to that board on Oct. 11, 1922, and thereafter had nothing to do with it whatever. Let us see whether this contention is sound and is supported by the evidence.

Relating to the present management of St. Agnes Hospital, Mother Kilian testified as follows (N. T., page 64): "Then, according to this answer, the staff officers and advisory board and superintendent yourselves conduct the St. Agnes Hospital management? A. Yes, sir." It appears from the minutes of the advisory board, defendants' Exhibit No. 14, that this body is named "An advisory board." "Advisory" is defined by the Century Dictionary to be "pertaining to, or giving advice; having power to advise; as, their power is only advisory; an advisory council." Webster defines the word as follows: "Having power to advise; pertaining to or containing advice; as an advisory council." We think the exact purpose of this board, as set forth in the minutes of Oct. 11, 1922, defendants' Exhibit No. 14, was to act in an advisory capacity; it was to hold weekly meetings if occasion required; to discuss matters pertaining to hospital efficiency and management; to recommend the appointment of internes; to consider problems in economics—hospital supplies; the adjustment of disputes between internes—internes and chiefs, etc.; and "to give help and explanation in technical matters to the directress, thereby assisting her in the discharge of her duties as *'medical directress.'*" Under this language the advisory board determines nothing. When the medical members of the board and Sisters Georgina and Laurentina could agree, then the *decisions rendered are "final, incontroversial."* We find nothing in the minutes of the advisory board of Oct. 11, 1922, which constitutes the authority of said board—which in any way indicates that the Sisters of St. Francis had turned over the entire management and control of St. Agnes Hospital to this board. It clearly appears that the recommendations of the board are only *"final* and *incontroversial"* when agreed to by Sisters Georgina and Laurentina. The Sisters of St. Francis had conducted the hospital for forty years. We, therefore, cannot assume that, because they did not know anything about conducting a hospital, after so conducting it for generations, they proposed to turn it over to the five doctors, a self-perpetuating body. It appeared from the evidence that "when buildings are to be erected, important repairs or any extensive work to be done, Mother Kilian is called into consultation" (N. T., pages 54, 60, 68). The corporation assists the hospital with money (N. T., page 75), yet Dr. O'Connell, the secretary of the advisory board, testified as follows: "By the Court: In other words, what I want to know is whether St. Francis supplies the money to make these repairs? A. No." (N. T., page 148.) The testimony of Dr. O'Connell seems to be in conflict with the testimony of Mother Mary Kilian, the Superior of the Sisters of St. Francis, who own the grounds and buildings in which St. Agnes Hospital is carried on.

It is interesting to consider why the advisory board was created. This information we glean from the testimony of Dr. O'Connell (N. T., page 146), in answer to a question propounded by the court: "The change came about in this way.—" The witness then proceeded to relate a difficulty which arose in the hospital with respect to the appointment of a certain surgeon on the hospital staff; severe pressure was brought to bear to secure his appointment. The medical director resigned rather than make the appointment.

the witness then proceeded (N. T., page 147) to state: "And then the hospital was without a head, so then there was lots of conditions that arose like that; so the men got together and wondered if there wasn't some way of getting. out of this thing and taking this hospital over and not having similar things arise. *The sisters weren't familiar with the running of an institution; they didn't know.* The Court: They were running it up to this time, were they? A. They had a medical director, no advisory board. Now the—. The Court: What I want to know is, can you answer—if you can, do so; if you cannot, say so; was it a denominational institution prior to that change? A. Well, now, they had a medical director. Now, what relationship there was, what different relationship between the hospital and medical director, and between the advisory board and this, I can't answer that question. But, at any rate, then the thing arose to get some other proposition, and this advisory board was the proposition. And the idea was to give this hospital over to this advisory board if for any reason at all they couldn't handle it. And, really, the way I view this advisory board is exactly as if we walked in that institution and rented that hospital; we are tenants there without paying rent."

It will be noted, therefore, that the institution of the advisory board was due, not to any difficulty in financial affairs or with respect to methods of conducting the hospital, nor for the purpose of divesting it of any sectarian characteristics which it may have had, but was caused by a conflict of opinion on a purely professional matter, namely, the method of selecting a surgeon, and by a dispute as to whether the appointment should be governed by personal influence or whether it should be controlled by what may be called civil service regulation.

The appointment of the members of the advisory board was made by Sister Georgina, the superintendent, called in the minutes the directress of the hospital. Sister Georgina, who appointed the advisory board, appears to have always been present at the meetings. While it was testified that she had no vote, we have heretofore directed attention to the fact that action of the advisory board was not "final and incontroversial" until it had been agreed to by Sisters Georgina and Laurentina. The matters considered by and acted on by the board were technical matters and within the scope of the medical and surgical profession. The minutes show no action by the board concerning plans or investments for raising money. No reference is made to the Ladies' Auxiliary, set forth in detail in the biennial report of the hospital (Exhibit No. 9). The report of the superintendent, Sister Georgina (Exhibit No. 9, page 5), for the calendar years of 1923 and 1924, shows the expenditures of very substantial sums for new boilers, new laboratory, two electrical elevators, and not a word do the minutes of the advisory board contain that they took any action authorizing the large expenditures of money; nor do they say that this board is the body that has under consideration the addition of two stories to the hospital. Furthermore, an examination of the minutes of the board shows that its meetings were held very irregularly.

It is also a significant fact that the contract entered into between the hospital and the Department of Welfare, under which the moneys involved in this controversy are claimed by the hospital, was signed, on behalf of the hospital, by Mother Kilian and attested by Sister Hiltrudes, who stated that she was the secretary of the organization and had no further connection with the hospital.

We are not convinced, therefore, that it was the intention of the Sisters of St. Francis, by the appointment of an *"Advisory Board,"* to surrender its

control over the management of St. Agnes Hospital. We are of the opinion, further, that our finding of fact that St. Agnes Hospital is operated by the Sisters of St. Francis, and that it is a sectarian and denominational institution, is sustained by the great weight of the believable testimony.

The facts in this case are very similar to those in the case of Passavant Hospital, an institution for many years operated by a sisterhood of the Evangelical Lutheran Church in the City of Allegheny. In that case a *"non-sectarian board"* was appointed to manage the hospital, consisting of five men of different religious faiths, with no authority in conflict with the internal management of the defendant corporation. It appeared that when more than $10,000 was to be expended the matter had first to be submitted to the Board of Protestant Deaconesses for approval, and that this latter board had the right, when the interest of the hospital so required, to demand the resignation of any or all members of the local board.

In the instant case an advisory board was appointed for a term of one year for the purposes heretofore set forth. This board was appointed by Sister Georgina, the superintendent of the hospital, and a member of the Sisters of St. Francis, the defendant corporation. There was nothing to prevent the Sisters of St. Francis from dismissing this board whenever it saw fit. The hospital was not leased to the advisory board by the owners, as was done in the case of St. Francis Hospital (Collins *v.* Lewis, 276 Pa. 428, 436), nor was the advisory board permitted to spend money upon the improvement of the buildings or its equipment without consulting the Mother Superior.

We think the conclusion of the Supreme Court in Collins *v.* Kephart, 271 Pa. 428, 436, relating to the Passavant Hospital, pronounced by Chief Justice Moschzisker, to wit, "It is quite apparent that the creation of the so-called local board represents simply an effort to make the Passavant Hospital appear as though it were not a denominational institution, . . ." may be applied to the facts in the instant case as we have found them to be.

We come next to consider the second and most important question involved in this controversy, to wit, does the payment of the *per diem* compensation by the Secretary of Welfare to St. Agnes Hospital, under the contract heretofore referred to, offend against and come within the inhibition of article III, section 18, of the Constitution of Pennsylvania?

We have found as a fact that St. Agnes Hospital is a sectarian or denominational institution. An appropriation by the legislature to it of a sum of money to compensate it for the treatment of the indigent sick and injured would violate article III, section 18, of the Constitution of Pennsylvania. We again quote from the opinion of the Chief Justice in Collins *v.* Kephart, *supra*, relating to Passavant Hospital: "The appropriation under attack, having in fact been made to a sectarian and denominational institution, cannot stand in law."

By the act in question "the sum of one million dollars . . . is hereby specifically appropriated to the Department of Welfare to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, . . . payments to be made at the rate of three dollars ($3) *per diem* for the medical and surgical treatment rendered to, and maintenance of, each person treated in said hospitals who is entitled to free service; . . . Provided, however, that no hospital shall receive compensation at a rate exceeding the actual cost of service *per capita* in the public ward of said hospital." The appropriation is to be paid on warrants of the Auditor General on a basis of settlement by that officer and the State Treasurer, after the directors and managers of the several medical and surgical

hospitals shall have made, on oath or affirmation to the Auditor General, a quarterly report setting forth the names of the indigent sick or injured persons received and treated in said hospitals for the sick and injured respectively during the quarter for which the report is made, provided "that no payment shall be made on account of the treatment of said indigent sick or injured persons until the Secretary of Welfare shall have certified to the Auditor General that the quarterly report setting forth the names of said indigent sick or injured persons contains no name other than that of patients entitled to receive care and treatment at the expense, in full or in part, of the State; and further provided, that no hospital shall, during any one year, receive more than one hundred thousand dollars ($100,000)."

The duty of the hospital, the Auditor General and State Treasurer and the Secretary of Welfare is clearly defined by the act. The act does not authorize the Secretary of the Department of Welfare to enter into contracts with hospitals; nevertheless, she did enter into the contract with St. Agnes Hospital, dated Sept. 21, 1925, as referred to in our finding of facts.

It is claimed by the plaintiffs that, in so far as the said Act No. 282 *a* (Appropriation Acts, Session of 1925, page 159) purports to authorize the payment of money out of the State Treasury through the medium of a contract or otherwise to any denominational or sectarian institution for charitable, educational or benevolent purposes, to such an extent the act violates article III, section 18, of the Constitution of Pennsylvania; that the act merely reimburses the several hospitals for money expended for charitable and benevolent purposes; that hospitals receiving direct appropriations bear the same relation to the Commonwealth as contract hospitals.

Article III, section 18, of the Constitution of Pennsylvania forbids the making of any appropriation "for *charitable, educational* or *benevolent* purposes . . . to any *denominational* or *sectarian institution, corporation* or *association*." If St. Agnes Hospital has any existence in law or in fact, separate and apart from the Sisters of St. Francis of Philadelphia, it is obvious that it must fall within these broad and inclusive terms used in the Constitution. It is either an "institution," a "corporation," or an "association," within the plain, generally understood or popular meaning of those terms. We have held as a matter of fact that it is a "sectarian association, corporation or institution," managed, owned and controlled by the Sisters of St. Francis, which, it is conceded, is an organization of the Catholic Church; it follows, therefore, that no appropriation of money may be made to it either directly or indirectly.

Again quoting from the opinion of the Chief Justice in Collins v. Kephart, *supra,* page 436, relating to the Passavant Hospital, it is said: "But that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt:" Busser v. Snyder, 282 Pa. 440, 452. Apropos of the appointment of an "*Advisory Board*" to manage the affairs of St. Agnes Hospital, we again quote from the opinion of the Chief Justice, referring to the Du Bois Hospital Association, Collins v. Kephart, *supra,* 439: "We cannot but see that the arrangement before us is nothing more nor less than a plan to evade the Constitution. No doubt the plan was honestly conceived, in the belief that it was permissible and would prove effective; but this makes it none the less a legal subterfuge. The pruning knife of the law eliminates all such devices, and lays bare the realities of the situation, with which we must deal; these show the hospital named in the Appropriation Act to be under the control of a well-known, much-respected religious order,

and the State's money cannot be permitted to go through the agency of the hospital association to this sectarian institution, since it falls within the class to which that character of recognition is forbidden by the Constitution."

We might rest our case on the facts as we have found them and the law so lucidly stated by the learned Chief Justice. It is earnestly contended, however, by the defendants that this is not an appropriation to St. Agnes Hospital, but an appropriation to the Department of Welfare, and that the Department of Welfare may, in its discretion, under the act, contract with and direct payments to be made to a sectarian hospital upon the theory that it is paying for service no more than the cost of such service to the institution to which it is to be paid, and, in any event, no payment is to be made in excess of the amount authorized by the act of assembly.

We do not think this position is sound. If the money appropriated to the Department of Welfare, or any part thereof, is in fact to be paid to an institution which we have held to be sectarian and denominational, it can make no difference how the money has been appropriated; the important and controlling question is whether the money so appropriated is to be paid to a denominational or sectarian institution. The complaint in this case does not appear to be that the legislature had no authority to appropriate a lump sum of money to the Department of Welfare to be expended as directed by the act, but that the administration of the fund so appropriated as proposed by the Department of Welfare is in violation of article III, section 18, of the Constitution of Pennsylvania, when it proposes to pay any part of said appropriation to a sectarian or denominational institution. With this contention we are in accord.

The act does not contemplate the execution of agreements for the rendering of service to the Commonwealth; it provides merely for the reimbursement of hospitals for moneys which have been already expended by them upon a basis of quarterly reports to the Auditor General. The appropriation is "to pay for the treatment of the indigent sick or injured," and is to be paid out upon the basis of quarterly reports made by the hospitals after they have rendered the services for which payment is to be made. The act itself contemplates purely and simply the distribution of money for charitable purposes through a central disbursing agency to such hospitals as show that they have expended money in caring for the indigent sick or injured. It is, therefore, just as much a charity when measured by a *per diem* for each person as it would be if given in a lump sum.

Prior to 1923 appropriations were made to various hospitals and other charitable institutions in a certain amount "or so much thereof as may be necessary for the purpose of maintenance." By the Act of March 15, 1899, P. L. 8, it was provided that payments were to be made from appropriations to educational, penal, reformatory, charitable, benevolent or eleemosynary institutions upon the rendition of quarterly reports made to the Auditor General showing in detail the operating account of the institution, and if, upon audit, it was found that a deficit had been incurred, the hospital was entitled to be reimbursed out of the appropriation. This system was changed by the Act of 1923, and appropriations are now made upon a *per diem* basis. This change simply means, however, that, instead of showing a general deficit in its operating account, the institution must show a deficit incurred in its account with certain indigent sick or injured persons, and it is to be reimbursed only for such deficits. Under both systems the acts provide for donations for reimbursement, *not* payments for service purchased.

It is clear that the Act of 1925 does nothing to impress upon the transac-

Collins *v.* Martin, Auditor General, et al.

tions between the Department of Welfare and the hospitals the character of a purchase and sale or a contract for services. There does not appear to be any substantial difference in the rules and regulations governing the payment of money to hospitals to which direct appropriations were made and the plan devised by the Secretary of Welfare for the administration of the fund appropriated to the Department of Welfare by the act under consideration. We think, therefore, that the execution of a contract by the Secretary of Welfare and a hospital creates no different relation than that which exists between the Commonwealth and those hospitals which have received direct appropriations. Though the contract purports to purchase days of hospital service, it does not bind the Commonwealth to pay even so much as the cost of these days of service if such cost exceeds $3. Patients are not sent to the hospital by the State. There is not and could not be an arrangement in advance to care for any designated patients, nor is the hospital obligated to receive and care for any one unless it chooses to do so.

It is further contended by the defendants that the effect of this contract made between the Secretary of the Department of Welfare and St. Agnes Hospital is similar to the purchase of any service or commodity, and that the construction of the constitutional provision, as contended for by plaintiffs, would prevent a sectarian institution, corporation or association from contracting with, or selling to, the Commonwealth. A reading of the constitutional provision discloses that this is not its effect; it is the purchase of *charity, education* or *benevolence* from a *sectarian institution* which is under the ban. There might be no sound objection made to the purchase of commodities from a sectarian institution upon such terms as would ordinarily be made with any other seller; but if the sale be upon such terms as to constitute in effect a donation to the institution, or if the subject-matter of the contract be *charity, education* or *benevolence*, then it is clearly, directly and forcefully forbidden by the Constitution.

Heretofore there has been no Pennsylvania decision in which this question has arisen. There are several well-considered cases in other jurisdictions, which we will now proceed to examine. In Synod of Dakota *v.* State of South Dakota, 14 L. R. A. 418, 50 N. W. Repr. 632, a contract was made by the territorial board of education with the plaintiff in 1887 for the instruction of a class of students in the methods of teaching at the Pierre University. Thereafter, South Dakota became a state and adopted a constitution, section 3 of article VI of which provides that no money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution; and section 16 of article VIII provides no appropriation of lands, money or credits to aid any sectarian school shall ever be made by the state or any county or municipality within the state. It was held that the purpose for which the plaintiff corporation was organized and exists was, and generally is, to maintain and promulgate the doctrine and belief of the Christian religion of the sect known as Presbyterians; that such university was a sectarian school, and that an action to recover compensation for the tuition and instruction furnished in the university by the plaintiff's instructors to said students being educated by the state did not lie and could not be recovered. This conclusion was reached by the Supreme Court of the State of South Dakota in an opinion written by Corson, J., the reasoning of which carries conviction.

The same contention was urged in the South Dakota case which we have before us, to wit, that the contract between the Department of Welfare and St. Agnes Hospital was to pay for services rendered. In disposing of this

Collins *v.* Martin, Auditor General, et al.

contention, Corson, J., says (see 14 L. R. A. 422): "But the learned counsel for plaintiff strenuously contends that the sum due plaintiff will not be contributed for the benefit of or to aid the university, but in payment for services rendered the state, or to its students, in preparing them for teaching in the public schools. This contention, while plausible, is, we think, unsound, and leads to absurd results. If the state can pay the tuition of twenty-five students, why may it not maintain at the institution all that the institution can accommodate, and thereby support the institution entirely by state funds? The theory contended for by counsel would, in effect, render nugatory the provisions of the constitution, as the claim that the appropriation was made as compensation for services rendered could be made in all cases. This theory, carried out to its legitimate results, would enable any one leading sect to control the schools, institutions and funds of the state, as it could claim it was rendering services for the funds appropriated."

In State of Nevada ex rel. Nevada Orphan Asylum *v.* J. H. Hallock, State Controller, 16 Nevada, 373, there was an act of assembly appropriating funds for the relief of several orphan asylums of the State of Nevada. A writ of mandamus was issued to compel the respondent to audit an account for $1279, and to issue a warrant on the State Treasurer for the sum in favor of the petitioner, the Nevada Orphan Asylum, said sum having been appropriated and allowed to petitioner by a majority of the board of asylum commissioners for support and maintenance of orphans and half-orphans. The Constitution of the State of Nevada provided "no public funds of any kind or character, whether state, county or municipal, shall be used for sectarian purposes." Held, that the petitioner was a sectarian institution and could not recover for the services rendered. It was claimed that even if petitioner was a sectarian institution wherein sectarianism is taught, still the money demanded, if paid, would not be used for sectarian purposes, but for the physical necessities of the orphans, and that it was no more than was required therefor. Disposing of this contention, it was said of the appropriation, "should it be given, it would be used for the relief and support of a sectarian institution, and, in part at least, for sectarian purposes. Should it be admitted that it would be used in part for legitimate purposes, it is impossible to separate the legitimate part from that which is forbidden."

Bennett *v.* City of La Grange et al., 153 Ga. 428, 112 S. E. Repr. 482, 22 Am. Law Reps. 1312, is similar to the instant case and involves many of the questions raised by the defence. An Ordinance of the City of La Grange provided that the city enter into a contract with the commanding officer of the local detachment of the Salvation Army, specifying that the charity work of the city would be assumed by them, not to exceed $75 per month, the Salvation Army to render itemized bills each month for this work, and that the mayor be authorized to sign said contract. Held, that this contract was in conflict with article I, section 1, paragraph 14, of the Constitution of the State of Georgia, under which it is provided no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religionists, or of any sectarian institution; and under another section it was provided that municipalities cannot expend money in their treasury for any of the purposes therein designated. The decision was rendered May 15, 1922, and written by Hinds, J., wherein it was held that the Salvation Army was a benevolent and religious institution. Again, it was contended in the Georgia case that the Salvation Army was only paid the actual amounts expended by it in taking care of the poor of La Grange, and then only to an amount not exceeding $75 a month, and that payments

are made to the Army or to local detachments only upon itemized bills for the service so rendered by it. We pause to direct attention to the similarity between the instant case and the Georgia case now under examination and consideration. The contract in the instant case provides for the payment to the defendant hospital of the actual cost of service rendered to the indigent sick and injured, not to exceed $3 a day, and that payments are to be made upon sworn statements being rendered to and approved by the Auditor General and State Treasurer, after having been examined and checked by the Secretary of the Department of Welfare.

After reviewing the South Dakota case to which we have referred, the case of Cook County v. Chicago Industrial School, 125 Ill. 540, 1 L. R. A. 437, and after referring to the later Illinois case, to wit, Dunn v. Chicago Industrial School, 280 Ill. 613, Judge Hinds says (22 Am. Law Reps. 1318): "We cannot agree with the conclusion reached by the Supreme Court of Illinois in this case." After referring to the religious grounds upon which such decision is based, Judge Hinds proceeds (22 Am. Law Reps. 1319): "The reasoning of the Supreme Court of Illinois in Dunn v. Chicago Industrial School, 280 Ill. 613, does not appeal to us. It is true that the Constitution of Illinois does not declare hostility to religion. So the Constitution of Georgia does not declare hostility to religion. The Constitution of Illinois declares in favor of religious liberty; so does the Constitution of Georgia. The Constitution of Illinois exempts property used for religious purposes from taxation; so does the Constitution of Georgia. But both constitutions declare against giving aid to sectarian schools and institutions. When the state selects a sectarian institution of learning, and commits to such institution its wards, for whose maintenance and education it pays, it gives the most substantial aid to such an institution. On the same principle, the state could undertake to educate all its children in such sectarian institution, and pay them for the education of its children in such institution rather than in public schools and public institutions of learning. . . . So we are of the opinion that the taking of money from the public treasury of the City of La Grange, in payment to the Salvation Army for its care of the poor of that city, amounts to the taking of money from its treasury, directly or indirectly, in aid of this sectarian institution, in violation of this provision of the Constitution of Georgia."

In a foot-note to this decision, found in 22 Am. Law Repr. 1319, it is said: "The weight of authority is to the effect that a contract between a state, county, city or other political sub-division and a sectarian institution, whereby the former agrees to pay the latter for services rendered, or expenditures incurred thereunder, is within the meaning of a constitutional provision inhibiting the use of public funds in aid of sectarian institutions, and void," citing numerous authorities. See, also, Richter v. Mayor and Aldermen of the City of Savannah et al., decided by the Supreme Court of Georgia, April 18, 1925, and reported in 160 Ga. 178, 127 S. E. Repr. 739. The same conclusion was reached by the Supreme Court of the State of Kentucky in Williams v. Board of Trustees of Stanton Common School District, 173 Ky. 708, L. R. A., 1917-D, 453.

We find many references in decisions of other states to the Illinois case of Cook County v. Chicago Industrial School for Girls, decided by the Supreme Court of Illinois in 1888, and reported in 1 L. R. A. 437, in which it was held the inhibition of section 3, article VIII, of the Illinois Constitution against any payment from public funds in aid of any sectarian institution prohibits payments by Cook County for the tuition and maintenance of dependent girls committed by the county court under the Act of May 28, 1879, to the Chicago

Collins v. Martin, Auditor General, et al.

Industrial School for Girls, a corporation which does not own or lease any building or conduct a school, but which places the girls committed to it in certain institutions under the control of the Roman Catholic Church, and to which institutions such payments would in fact go. The opinion of the Supreme Court was written by McGruder, J., is exhaustive, logical and convincing, from which we quote (see 1 L. R. A. 445): "If, on the one side, a statute directs the county board to pay money to a school which appears not on the face of the statute, but from outside proof, to be controlled by a church, and if, on the other side, the constitution, in a self-executing provision, directs the county board not to pay money to such a school, which direction is to be followed? We answer, unhesitatingly, the latter. When the constitution says, 'You must not pay,' it must be obeyed in preference to a statute which says, 'You must pay.' And this is true not only where the statute on its face is in conflict with the constitutional provision, *but also in a case where an attempt to apply the statute to a given state of facts gives rise to a violation of such provision.*" Still further quoting from the opinion of Judge McGruder (1 L. R. A. 446): "It cannot be said that a contribution is no aid to an institution because such contribution is made in return for services rendered or work done. A school is aided by the patronage of its pupils, even if they do pay for their tuition. Because the customers of a merchant pay for their goods, it is none the less true that his business is aided by their custom. . . . The doctrine here contended for is an exceedingly dangerous one."

Referring again to the very well-considered South Dakota case, we find the provisions of the constitution of that state are not as broad as those of our own Constitution. They forbid appropriation for the "benefit of" or "to aid" any sectarian institution, and it was strongly urged by the plaintiff, since the payment claimed was to be made for service actually rendered, a valuable and adequate consideration being given for the money, it was not for the benefit of or to aid the university. The court very definitely and forcibly rejected this contention. When we examine our own Constitution, we find that its provisions are much broader. It says that no appropriation for charitable, educational or benevolent purposes shall be made to any denominational or sectarian institution, regardless of its financial effect upon the institution receiving the appropriation. Accordingly, under our Constitution, whether the receipt of an appropriation be found to be for the benefit of or to aid an institution is not material; it is forbidden if it be for *charitable, educational* or *benevolent* purposes. The same difference may be noted between our Constitution and that of Illinois. We have examined the later Illinois cases and must decline to follow the conclusions reached therein. We quite agree with the Supreme Court of Georgia in deciding that the reasoning contained in those cases is not sound.

There can be no doubt that the contract made by the Department of Welfare with the St. Agnes Hospital, resulting in a claim from said hospital that a large amount is due for services under the contract, to be paid out of the appropriation made to the Department of Welfare, will aid the said hospital by additional patronage, by the advertisement that each case gives to it, by its enhanced reputation for services. The Sisters of St. Francis will be aided because such money as is paid to the hospital to reimburse it for services rendered relieves them from appropriating that much of their private fund for hospital services, leaving more available for the establishment of schools, one of the essential objects of the corporation, and the other sectarian objects of their order.

It is further contended by counsel for the defendants that the care and

treatment of the indigent sick and injured is a governmental duty. This is conceded by counsel for the plaintiff. Mr. Justice Kephart in the Busser case says: "There is no direct prohibition against the use of State money to pay for the care and maintenance of indigent, infirm and mentally defective persons without ability or means to sustain themselves, and other charges of a like nature. They become direct charges on the body politic for its own preservation and protection. As such, in the light of an expense, they stand exactly in the same position as the preservation of law and order. To provide institutions or to compensate such institutions for the care and maintenance of this class of persons has for a long time been recognized as a governmental duty, and where institutions are compensated (except as hereinafter noted) for the care of indigent, infirm and mentally defective, including certain physically defective, persons, such appropriations may well be sustained on this theory. The expenditure of money for such purposes is, and long has been, recognized as a function of government, and the manner of its administration is restricted only by section 18 of article III, as stated by this court in Collins v. State Treasurer, supra: 'The intent of these provisions was, and therefore still is, to forbid the State from giving, either directly or indirectly, any recognition to a religious sect or denomination, even in the fields of public charity and education. They, in effect, provide that, to serve charitable, educational or benevolent purposes, the money of the people shall not be put under denominational control or into sectarian hands for administration or distribution, no matter how worthy the end in view.' Appropriations to liquidate these expenses cannot be made, directly or indirectly, through a department or agency, to denominational or sectarian institutions:" Busser v. Snyder, 282 Pa. 440, 453.

Nor can we agree with the contention of the defendant that because the appropriation was made to the Department of Welfare and not to the hospital or to the indigent sick and injured, that the legislature has invested a certain discretion in the department in spending the money. We think no such discretion was given to the Department of Welfare either by the Code or by the Appropriation Act. Section 2017 of the Administrative Code gives to the Department of Welfare the power to issue requisitions "in favor of such hospitals as shall conform to at least the minimum standards of plant, equipment, service, administration and care and treatment established by law, in amounts computed upon the *per diem* rates of payment established by law for free service to indigent persons." It is perfectly apparent that until the minimum standards have been established by law the Department of Welfare is without power to establish such standards of plant, equipment, service, administration, etc. We think the reference in section 2017 (a) to such standards is empty language until such time as the legislature establishes such standards or gives the department such power to do so. As to *per diem* rates, they have been established by law in the Appropriation Act in question, but the department has not been given any power or discretion to establish, change or alter them. The power given to the department by section 2017 (a) of the Code is thus seen to be a mere power to issue requisitions; a power which is purely ministerial and not coupled with the exercise of any official discretion.

We find nothing further in the contentions of counsel for defendants which requires discussion or which in any way alters the conclusions which we have reached. We cannot better conclude this opinion than by quoting from the concluding paragraphs of the opinion of the learned Chief Justice in Collins v. Kephart, 271 Pa. 440, 441:

Collins *v.* Martin, Auditor General, et al.

"There can be no doubt that all the institutions at bar are worthy charities; but it is equally clear they are within the inhibited class, so far as State aid is concerned. We did not write the Constitution; but, whether agreeing with or dissenting from the rules of public policy there announced, our sworn duty is to enforce them. Those who adopted the restriction against appropriating money to sectarian institutions must change the rule, if desired, either through an amendment to the present Constitution or by making a new one; neither the legislature, acting alone, nor the courts have power so to do.

"We are always loath to put a construction on legislation which shows it to be invalid; . . . but if constitutions are to command general respect and obedience, the people must know that their courts will constantly endeavor to interpret them according to the commonly-accepted understanding of the words used therein; and, when this rule is applied to the facts before us, the result is inevitable."

We adopt this language of the learnèd Chief Justice as our own. We conclude, therefore, that the payment of the sum heretofore referred to to St. Agnes Hospital would be in violation of section 18 of article III of the Constitution of Pennsylvania.

### Conclusions of law.

1. The Sisters of St. Francis of Philadelphia is a sectarian or denominational corporation.

2. St. Agnes Hospital is affiliated with the Sisters of St. Francis of Philadelphia and with the Roman Catholic Church, a particular religious sect or denomination.

3. St. Agnes Hospital is under the control, domination or governing influence of the Sisters of St. Francis of Philadelphia and of the Roman Catholic Church, a particular religious sect or denomination.

4. St. Agnes Hospital is a denominational or sectarian institution.

5. The Act of Assembly of April 13, 1925, purporting to make an appropriation of $1,000,000 to the Department of Welfare to pay for the treatment of the indigent sick or injured in medical and surgical hospitals not owned by the Commonwealth, is an appropriation for charitable, educational or benevolent purposes.

6. It is an untenable position that public funds may be paid out to help sectarian institutions, provided only such institutions shall render a *quid pro quo* for the payments made to them. The Constitution declares against using the public funds to aid any sectarian institution, independent of the question whether there is or is not a consideration furnished in return for the funds so appropriated.

7. The proposed payment of the sum of $10,532.57 to St. Agnes Hospital out of moneys appropriated by the legislature to the Department of Welfare by Act 282 *(a)* (Appropriation Acts, Session of 1925, page 159) is in violation of article III, section 18, of the Constitution of Pennsylvania.

8. The cost of these proceedings are to be paid by the defendants.

### Decree nisi.

And now, Sept. 15, 1926, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

That the defendant, Edward Martin, Auditor General, and his successors be and he is perpetually restrained and enjoined from making a settlement with the State Treasurer of Pennsylvania on the report submitted by St. Agnes Hospital and from issuing a warrant thereon.

Collins v. Martin, Auditor General, et al.

That the said defendant, Samuel S. Lewis, State Treasurer, and his successors be and he is perpetually restrained and enjoined from approving and allowing the disbursement and payment of said money, or any part thereof, to said St. Agnes Hospital, or to any person for or in its behalf; and

That the said St. Agnes Hospital be and it is hereby restrained and enjoined from receiving or accepting said sum of money, or any part thereof, as demanded by it.

The costs of these proceedings are to be paid by the defendants.

From Homer L. Kreider, Harrisburg, Pa.